# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO.

12-3839 BLS

THE SALK INSTITUTE FOR BIOLOGICAL
STUDIES,

Plaintiff,

v.

ACCELERON PHARMA, INC.,

Defendant,

and

SILICON VALLEY BANK,

Trustee Process Defendant.

**VERIFIED COMPLAINT**

Plaintiff, The Salk Institute for Biological Studies ("Salk"), a world renowned

non-profit science research institute, alleges, on personal knowledge as to itself and

otherwise on information and belief, as follows:

**INTRODUCTION**[1]

1.      This action arises out of the failure of Defendant Acceleron Pharma, Inc.

("Acceleron") to honor its clear contractual obligations to pay Salk over $9 million for

---

[1] As set forth in its Motion for Trustee Process Attachment and supporting papers, filed
concurrently with this Verified Complaint, Salk seeks prejudgment security in the form of trustee
process attachment on Acceleron's bank account with Trustee Process Defendant Silicon Valley
Bank.

- 1 -

using the biological receptor inventions emanating from the lab of one of Salk's most respected and prolific, but now deceased, scientists, Dr. Wylie Vale, Ph.D.

2.      Dr. Vale was one of Acceleron's co-founders, contributing (through his work at Salk) the fundamental inventions, technology, scientific know-how and patents that serve as the primary basis for Acceleron's business and success. Dr. Vale served on Acceleron's scientific advisory board and was an integral member of Acceleron's team. Dr. Vale tragically and prematurely passed away in early 2012.

3.      Salk and Acceleron signed an Exclusive License Agreement on May 10, 2004 relating to Activin Receptors for Therapeutic and Diagnostic Purposes (the "May 2004 License"), which gave Acceleron exclusive access to Dr. Vale's discovery of certain "signaling receptor" proteins from the TGF-$\beta$ superfamily, which transmit signals within cells related to hormone effect and regulation. Dr. Vale's discoveries are ground-breaking, pioneering inventions that have enabled the further discovery of previously unknown drugs designed to treat human diseases.

4.      Acceleron utilized the rights granted under the May 2004 License and its subsequent amendments as a platform technology for discovering drugs for eventual clinical development, and ultimately entered agreements with third-party pharmaceutical partners for further clinical development and commercialization of products encompassed by, or arising from, use of the licensed technology. While Acceleron agreed under the May 2004 License to share its financial success with Salk in return for Salk's enabling inventions and discoveries, Acceleron has failed to make good on its contractual obligations, providing Salk with repeated excuses, evasion and refusal in lieu of the compensation owed to it.

5.      Specifically, Acceleron has to date received at least $77.5 million pursuant to agreements with third-party pharmaceutical partners, consisting of $45 million in connection with the development of the drug compound known as ACE-031 and $32.5 million in connection with the development of the drug compound known as ACE-536. Having discovered these payments, having requested its contractual share and having being denied the compensation owed to it, Salk is left with no recourse other than to bring this suit to recover its due share of the $77.5 million, an amount totaling $9.125 million plus compounded interest, and to establish its rights to its share of the sublicensing revenue received by Acceleron pursuant to third-party agreements.

## PARTIES

6.      Salk is a non-profit scientific research institute with its principal place of business at 10010 North Torrey Pines Road, La Jolla, California 92037.

7.      Salk was founded in 1960 by scientific pioneer Jonas Salk, M.D., following his invention and development of the polio vaccine, which saved countless families and children around the world from this hideously cruel disease that so often led to death, deformity, or life in an iron lung. In founding the Institute, Jonas Salk sought to create an environment that would serve as a "crucible for creativity," where biologists and other scientists could work together to pursue therapies and cures for the benefit of humanity. The Salk Institute's major areas of study include molecular biology, genetics, neurosciences, and plant biology. Knowledge acquired in Salk's laboratories provides new understanding and potential therapies and treatments for a wide range of diseases and disorders, including cancer, AIDS, Alzheimer's disease, cardiovascular disease, and birth defects and has paved the way to improving the quality and quantity of the world's

food supply.  The Salk Institute is recognized across the world as one of the most renowned biological research institutions, having contributed hundreds of fundamental discoveries to mankind.  Salk was recently ranked by SCImago Institution Rankings (SIR) World Report as number 5 out of over 3,000 research institutions around the world based on the excellence and high quality of Salk's research findings.  Today, Salk employs a staff consisting of more than 850 resident and visiting scientists, postdoctoral fellows and graduate students who conduct fundamental scientific research relating to molecular biology and genetics, neuroscience and plant biology under the guidance of 59 faculty investigators. The Salk Institute has trained more than 2,700 scientists, many of whom have gone on to positions of leadership in prominent research centers worldwide. Five scientists trained at The Salk Institute have won Nobel Prizes and three current resident faculty members are Nobel Laureates.  The Salk Institute's faculty includes 16 members of the National Academy of Sciences, one of the most highly respected scientific organizations in the world.  Originally funded by a grant from the March of Dimes, Salk is currently funded by charitable gifts, bequests and government research funding.  An additional means of funding its important research is fees obtained by licensing others to make, use, and sell inventions discovered by Salk scientists.

8. On information and belief, Acceleron is a Delaware corporation founded in 2003, with a principal place of business at 128 Sidney Street, Cambridge, Massachusetts 02139, and doing business in this jurisdiction.

9. On information and belief, Trustee Process Defendant Silicon Valley Bank is a California bank subsidiary, with an office located at 275 Grove Street, Suite 2-200, Newton, Massachusetts 02466.  Silicon Valley Bank is named as a nominal, Trustee

Process Defendant for the purpose of obtaining prejudgment security as set forth in

Salk's concurrently-filed Motion for Trustee Process Attachment.

**JURISDICTION AND VENUE**

10.     Jurisdiction and venue are conferred on this Court pursuant to Mass. Gen. L. c.

223A § 1 and Mass. Gen. L. § 1, respectively.

**FACTUAL BACKGROUND**

*The Salk Activin Receptor Technology*

11.     Well before the founding of Acceleron in 2003, Dr. Wylie Vale of Salk

was a world-renowned neuro-endocrinologist whose identification and characterization of

various hormones had contributed to Nobel Prize-winning discoveries in the field.   Dr.

Vale also co-discovered and characterized the protein activin A, a member the TGF-

β/BMP family of growth factors that is believed to be involved in a variety of cellular

processes, including hormone regulation and secretion, cell proliferation and

differentiation, and immune response.   In addition, prior to 2003, Dr. Vale and his

colleagues at Salk also discovered a receptor protein that binds activin and transmits an

intracellular signal known as the type II activin receptor.    These discoveries were

revolutionary, critical and fundamental to mankind's understanding of human biology

and the treatment of disease.

12.     Four United States patents were issued to Dr. Vale and his colleagues for

their work on activin receptors, each of which was assigned to Salk:  (1) U.S. Patent No.

5,885,794 – Recombinant production of vertebrate activin receptor polypeptides and

identification of receptor DNAs in the activin/TGF-β superfamily; (2) U.S. Patent No.

6,162,896 – Recombinant vertebrate activin receptors; (3) U.S. Patent No. 6,835,544 –

- 5 -

Methods of screening for compounds that bind to activin receptor; and (4) U.S. Patent No. 7,893,213 – Antibodies to activin receptor.   Collectively, these are known as the "Salk Activin Receptor Patents" and the patents and related know-how and materials are referred to herein as the "Salk Activin Receptor Technology."  The Salk Activin Receptor Patents relate to several protein therapeutic products, including both Activin Receptor Type II-B ("ActRIIB") products and Activin Receptor Type II-A ("ActRIIA") products.

**The 2003 Founding of Acceleron and the May 2004 License Agreement**

13.     Acceleron was founded in 2003 by Salk's Dr. Wylie Vale, and others including John Knopf, Jasbir Seehra, Christoph Westphal, Tom Maniatis and Mark Ptashne.

14.     In March 2004, Acceleron's business founders commenced licensing discussions with Salk, seeking an exclusive license to Dr. Vale's and Salk's Activin Receptor Patents and Technology.  Following negotiations in April and early May of 2004, Salk and Acceleron entered into the May 2004 License.  A true and correct copy of the May 2004 License is attached hereto as Exhibit 1.

15.     The May 2004 License granted Acceleron:  (1) an exclusive, worldwide license, including the right to grant sublicenses, to develop, have developed, make, have made, use, have used, import, have imported, offer for sale, sell and have sold Primary Licensed Products, defined as "any therapeutic product (such as Activin receptors, or antibodies to the receptors, or other large molecules) the use, sale or practice of which is covered by a Valid Claim included in the Patent Rights," and (2) a nonexclusive license, without the right to sublicense, to develop, have developed, make, have made, use, have used, import, have imported, offer for sale, sell and have sold Secondary Licensed

Products, defined as "any therapeutic and diagnostic product, other than a Primary Licensed Product, discovered, developed and/or identified using the Patent Rights, to the extent covered by a Valid Claim."

***The February 2008 Letter Agreement***

16.     On or about December 2007, Acceleron asked to amend the May 2004 License to include the right to sublicense Secondary Licensed Products in addition to Primary Licensed Products, which would provide Acceleron with even more latitude to monetize Salk's and Dr. Vale's Activin Receptor Patents and Technology.   During the course of these negotiations, John Quisel, Acceleron's Senior Director of Intellectual Property and Legal Affairs, expressed concern on behalf of Acceleron's pharmaceutical partners "that the definition of Secondary Licensed products is complex and at least in one case includes a situation where a Primary Licensed Product (which is sublicensable [under the May 2004 License]) switches over to being a Secondary Licensed Product (which is not [sublicensable under the May 2004 License])."   As a "simple fix," Dr. Quisel proposed that the amended license agreement "make these products all sublicensable."   A true and correct copy of this correspondence is attached hereto as Exhibit 2.

17.     Salk eventually agreed to expand the May 2004 License in the manner proposed by Acceleron, granting Acceleron the right to sublicense both Secondary Licensed Products and Primary Licensed Products.   Accordingly, on or about February 12, 2008, the parties entered into a Letter Agreement (the "February 2008 Letter Agreement"), whereby Section 2.2 of the May 2004 License was amended to grant Acceleron "the right to grant sublicenses . . . if such sublicense is in connection with a

sublicense of a Primary Licensed Product (including a Primary Licensed Product that

subsequently becomes a Secondary Licensed Product) or in connection with a sublicense

of a Secondary Licensed Product that is first discovered or identified by [Acceleron]." A

true and correct copy of the February 2008 Letter Agreement is attached hereto as Exhibit

3.

### The March 2009 Letter Agreement

18.     The following year, prior to March 30, 2009, Acceleron approached Salk

again, seeking a side letter agreement regarding certain payments owed by Acceleron to

Salk.  As a result, the parties entered into a second Letter Agreement (the "March 2009

Letter Agreement"), which memorialized an agreement between Salk and Acceleron

regarding activin receptor type IIA ("ActRIIA") products.  A true and correct copy of the

March 2009 Letter Agreement is attached hereto as Exhibit 4.

As set forth in the March 2009 Letter Agreement, the parties reached a consensus with
respect to payments due to Salk in connection with an agreement between Acceleron and
Celgene Corporation ("Celgene"), one of Acceleron's primary pharmaceutical partners
and significant investors, regarding the development of ActRIIA products.  In the March
2009 Letter Agreement, the parties acknowledged that the Salk Activin Receptor Patents
are United States patents and agreed to reduce the share of Sublicensing Revenue owed
by Acceleron to Salk from 15% to 7.125% in accordance with a formula based upon the
territorial reach of the licensed patent rights in relation to total, worldwide rights.  As
made clear in the March 2009 Letter Agreement, however, this agreement concerned only
the share of Sublicensing Revenue due to Salk in connection with "the exclusive license
granted by Acceleron to Celgene for the development of **ActRIIA-Fc** products" (the
"Celgene ActRIIA Agreement").

### The ActRIIA and the ActRIIB Separate Licenses

19.     In August 2010, at Acceleron's further request, Salk and Acceleron

amended and restated the underlying May 2004 License so as to separate the agreement,

which governed Salk's grant of rights relating to both Activin Receptors Type IIA and

Type IIB, into two agreements:  (1) the August 10, 2010 Exclusive License Agreement

between Salk and Acceleron governing Activin Receptors (Type IIA) and Related Subject Matter for Therapeutic and Diagnostic Purposes (the "ActRIIA License"); and (2) the August 11, 2010 Exclusive License Agreement between Salk and Acceleron governing Activin Receptors (Type IIB) and Related Subject Matter for Therapeutic and Diagnostic Purposes (the "ActRIIB License"). True and correct copies of the ActRIIA License and the ActRIIB License are attached hereto as Exhibits 5 and 6, respectively.

**The August 10, 2010 ActRIIA License**

20.     Section 3.5 of the ActRIIA License governs the share of Sublicensing Revenue owed by Acceleron to Salk and expressly incorporates the terms of the March 2009 Letter Agreement. Thus, while the ActRIIA License retains the original language of the May 2004 License with respect to Sublicensing Revenue generally, Section 3.5 includes a supplementary provision stating that Acceleron shall pay to Salk a share of "Sublicensing Revenue received by [Acceleron] pursuant to [Acceleron's exclusive license to Celgene for the development of ActRIIA products] . . . as described in the [March 2009 Letter Agreement]"—or in other words, 7.125% of the amount of Sublicensing Revenue received by Acceleron in connection with the Celgene ActRIIA Agreement.

**The August 11, 2010 ActRIIB License**

21.     In stark contrast to the ActRIIA License, the ActRIIB License makes <u>no</u> reference to either the March 2009 Letter Agreement or the reduced 7.125% share of Sublicensing Revenue due to Salk in connection with the Celgene ActRIIA Agreement.

22.     With respect to sublicensing, Section 2.2(a) of the ActRIIB License incorporates the language of the February 2008 Letter Agreement and makes clear that Acceleron shall have

the right to grant Sublicenses in connection with both Primary Licensed Products and Secondary Licensed Products:

> **Sublicenses**. Licensee shall have the right to grant sublicenses consistent with this Agreement ("Sublicenses"). . . . Licensee shall have the right to grant sublicenses to all of the rights granted under Section 2.1(b) if such sublicense is in connection with a sublicense of a Primary Licensed Product (including a Primary Licensed Product that subsequently becomes a Secondary Licensed Product) or in connection with a sublicense of a Secondary Licensed Product that is first discovered or identified by Licensee.

23.     In exchange for these rights, the ActRIIB License directs that Salk shall receive a share of "Sublicensing Revenue," broadly defined in Section 1.15 as "all upfront, license, and technology access fees, product milestone payments . . . and other remuneration, however characterized . . ., owed to or received by Licensee under any Sublicense or Sub-sublicense of the rights granted hereunder with a third party for the use of the Licensed Technology by the third party and/or the sale by a third party of any Licensed Product," defined in Section 1.6 as "any Primary Licensed Product and/or Secondary Licensed Product."

24.     In turn, Section 3.5 of the ActRIIB License sets forth the specific share of Sublicensing Revenue due to Salk as follows:

> 15% of amount of Sublicensing Revenue received if sublicense granted prior to initiation of the first Phase II clinical trial for a Licensed Product

> 10% of amount of Sublicensing Revenue received if sublicense granted anytime after the initiation of the first Phase II clinical trial for a Licensed Product.

Unlike the ActRIIA License which incorporates the March 2009 Letter Agreement, Section 3.5 of the ActRIIB License retains the original language set forth in the May 2004 License—with no supplementary provisions.

***Acceleron's Receipt of ActRIIB Sublicensing Revenue and Failure to Pay Salk Its Share***

25.     Following the execution of the ActRIIB License on August 11, 2010,

- 10 -

Acceleron entered into two agreements with separate pharmaceutical partners for the purpose of developing and commercializing Activin Receptor Type II-B products.

**Payments Due to Salk Under Acceleron's Shire Pharmaceuticals ActRIIB Sublicense Agreement**

26.     Acceleron entered into a License and Collaboration Agreement with Shire AG ("Shire"), a Swiss biopharmaceutical company, on or about September 8, 2010 (the "Shire Agreement").

27.     Under the terms of the Shire Agreement, Acceleron and Shire are collaborating to develop and commercialize a drug compound known as ACE-031 for treatment of Duchenne muscular dystrophy.   ACE-031 is an investigational protein therapeutic that increases skeletal muscle by preventing growth inhibitors in the TGF-$\beta$ superfamily from interacting with activin type IIB receptors on muscle cells, and is a Primary Licensed Product under the ActRIIB License between Salk and Acceleron.

28.     The Shire Agreement grants Shire several rights with respect to "Licensed Compounds" such as ACE-031, including a non-exclusive license to develop Licensed Compounds in North America and a non-exclusive license to manufacture non-clinical and pre-clinical supplies of Licensed Compounds in North America.

29.     In exchange for the rights granted to Shire in the Shire Agreement, Acceleron received an up-front payment of $45 million from Shire on or about September 2010.

30.     According to ClinicalTrials.gov, a website made available by the United States National Institutes of Health, Acceleron has sponsored two completed Phase-1 studies of ACE-031 and has initiated two Phase-2 studies of ACE-031.   Because Acceleron and Shire entered into the Shire Agreement after the initiation of the first

Phase II clinical trial for a Licensed Product, Section 3.5 of the ActRIIB License provides

that Acceleron owes Salk 10% of the $45 million up-front payment received from Shire,

*i.e.*, $4.5 million.

31.     On or about October 20, 2010, following receipt of the $45 million up-front payment from Shire, John Quisel of Acceleron wrote to Constance Mueller, Business Manager of the Office of Technology Management at Salk, informing Salk of the Shire Agreement and Acceleron's receipt of the $45 million up-front payment.  In this letter, Dr. Quisel set forth a series of calculations that he maintained reduced Salk's 10% share of Sublicensing Revenue, as prescribed in Section 3.5 of the ActRIIB License for a sublicense granted anytime after the initiation of the first Phase II clinical trial, to 0.5%. Based on these calculations, Dr. Quisel and Acceleron unilaterally, and falsely, asserted that Salk was entitled to receive only $225,000 in connection with the $45 million up-front payment from Shire to Acceleron, rather than the $4.5 million mandated by the express language of Section 3.5.

32.     Acceleron sent Salk a check for $225,000, but Salk has never agreed that $225,000 satisfies the $4.5 million obligation owed by Acceleron under the ActRIIB License.

33.     On or about May 26, 2011, in an effort to obtain full payment of the Sublicensing Revenue contractually owed to Salk, Robert MacWright, Salk's Executive Director of the Office of Technology Development wrote to Dr. Quisel, noting that Salk had not agreed to any reduction of the amount due under Section 3.5 of the ActRIIB License and requesting further information to understand and assess the basis and rationale for Acceleron's faulty calculations.

34.    Three months later Acceleron responded with a non-response.  Dr. Quisel wrote to Dr. MacWright on or about August 23, 2011, once again simply asserting that Salk was only entitled to a reduced share of Shire Sublicensing Revenue totaling $225,000.

35.    Because Salk had never agreed to any reduction of Sublicensing Revenue due to Salk under Section 3.5 of the ActRIIB License, Dr. MacWright sent an invoice to Dr. Quisel on or about December 19, 2011 (the "December 2011 Invoice"), requesting payment of $4,275,000—an amount representing Salk's full 10% share of the $45 million upfront payment received by Acceleron from Shire, less the $225,000 paid by Acceleron to Shire in the fall of 2010—plus interest of 1.5% compounded monthly on its late payment.

36.    As of the filing of this Verified Complaint, Acceleron has refused to pay Salk the full amount due, and has instead only paid Salk $225,000 of the $4.5 million owed to Salk in connection with the $45 million up-front payment that Acceleron received from Shire, and has likewise failed to pay interest in the amount of 1.5% compounded monthly on its late outstanding payment, as required by Section 9.5 of the ActRIIB License.

37.    Acceleron refuses to acknowledge the full extent of its obligations under Section 3.5 of the ActRIIB License in connection with the payment received pursuant to the Shire Agreement.

**Payment Due Salk Under the Celgene ActRIIB Sublicense Agreement**

38.    On or about August 2, 2011, Acceleron entered into a Collaboration, License and Option Agreement with Celgene (the "Celgene Agreement").

39.     The Celgene Agreement grants Celgene a number of rights with respect to Acceleron's "Licensed Compounds," a term defined to include ACE-536, at least a Secondary Licensed Product under the ActRIIB License between Salk and Acceleron. Section 4.1 of the Celgene Agreement grants Celgene "an exclusive, royalty-bearing license . . . to offer for sale, sell, make, have made, use and import Licensed Compounds and Licensed Products" including ACE-536.

40.     ACE-536 is an investigational protein therapeutic that increases red blood cell (RBC) levels by targeting molecules in the TGF-β superfamily.   Acceleron and Celgene are developing ACE-536 to treat anemia in patients with rare blood disorders. According to ClinicalTrials.gov, Acceleron is currently sponsoring a Phase-1 study of ACE-536.

41.     In exchange for the rights granted to Celgene in the Celgene Agreement, Acceleron received an up-front payment of $25 million from Celgene on or about August 2011, along with an additional payment of $7.5 million in September 2011 upon the initiation of the Phase-1 clinical study of ACE-536, a milestone event under the Celgene Agreement.

42.     Because Acceleron and Celgene entered into the Celgene Agreement prior to the initiation of the first Phase II clinical trial for a Licensed Product, Salk's allotted share of payments from Celgene to Acceleron under Section 3.5 of the ActRIIB License is 15%, i.e, $4.875 million.

43.     Even though the Celgene Agreement grants Celgene the right to make, use and sell ACE-536, at least a Secondary Licensed Products under the ActRIIB License, Acceleron was not forthcoming with Salk about the Celgene Agreement and failed to

inform Salk of the payments it received from Celgene.   Salk first learned of these payments in the midst of its investigation into Acceleron's underpayment of Sublicensing Revenue in connection with the Shire Agreement, through press releases regarding Acceleron's collaboration with Celgene.

44.     After learning of the payments from Celgene to Acceleron, Dr. MacWright sought payment from Acceleron pursuant to Section 3.5 of the ActRIIB License.   Accordingly, as part of the December 2011 Invoice, Dr. MacWright requested payment of $3.75 million—an amount representing the 15% share of the $25 million up-front payment prescribed in Section 3.5 of the ActRIIB License for a sublicense granted prior to the initiation of the first Phase II clinical trial—plus interest of 1.5% compounded monthly.   Dr. MacWright also noted in the cover email attaching the invoice that an additional payment would be due to Salk by January 30, 2012, in the amount of $1,125,000, that is, 15% of the $7.5 million milestone payment made by Celgene to Acceleron in October 2011.

45.     In a response dated January 11, 2012, Acceleron refused to acknowledge its obligations under Section 3.5 of the ActRIIB License in connection with payments received pursuant to the Celgene Agreement.   Acceleron asserted that no payments were due to Salk because the ActRIIB License defines "Sublicensing Revenue" as revenue received by Acceleron under a "sublicense" of Salk's patent rights.   According to Acceleron, it should not have to pay Salk because although ACE-536 is at least a Secondary Licensed Product (which means a product discovered or identified using the Salk Activin Receptor Technology), the ACE-536 product is not directly covered by Salk's patent rights.   Contrary to the clear contractual language of the ActRIIB License,

- 15 -

Acceleron now artfully asserts that only products directly covered by Salk patents are sublicensable, and claims that because ACE-536 is not covered by a Salk patent, the rights granted to Celgene in the Celgene Agreement are not a sublicense of Salk's license to Acceleron, but rather a direct license of Acceleron's own intellectual property.

46.     While Acceleron may have intellectual property covering ACE-536, those rights do not vitiate Acceleron's contractual obligations to compensate Salk for having used the "Salk Activin Receptor Patents" and "Salk Activin Receptor Technology" to "discover, identify and develop" ACE-536.  Indeed, Acceleron's purported excuses for not paying Salk disregard the clear and plain definition of "Sublicenses" in the ActRIIB License, **Section 2.2**.  That definition expressly includes "sublicense of a Secondary Licensed Product that is first discovered or identified by Licensee," and thus includes Acceleron's sublicense of ACE-536 to Celgene.  Likewise, **Section 1.15** of the ActRIIB License further defines "Sublicensing Revenue" to include all fees, payments and remuneration owed to or received by Acceleron under any Sublicense with a third party for "the sale by a third party of any Licensed Product," a term expressly defined in **Section 1.6** of the ActRIIB License to mean "any Primary Licensed Product and/or Secondary Licensed Product."

47.     Moreover, Salk's position is consistent with Acceleron's own statements and admissions made by Dr. Quisel at the time of the drafting and negotiation of the February 2008 Letter Agreement.  At that time, Acceleron, through Dr. Quisel, specifically sought the right to sublicense Secondary Licensed Products.  During the negotiation process, Dr. Quisel not only requested a "simple fix" whereby both Primary and Secondary Products would be sublicensable, but also articulated Acceleron's position

regarding the type of Secondary Licensed Products that Acceleron wished to make sublicensable, and for which it recognized it would owe Salk compensation.  In Dr. Quisel's December 6, 2007 email to Anne-Marie Mueller, then Director of the Office of Technology Management at Salk, Dr. Quisel explained why Acceleron desired to make Secondary Licensed Products sublicensable to Acceleron' partners, writing:

> For our discussions about sublicensing 'Secondary Licensed Products', I thought it would be helpful to break out what is embedded in that definition, so that we can each get a better handle on what makes a sublicensee nervous.  Here's my breakout . . . (a) Therapeutic product not covered by the Patent Rights but discovered using a tool that infringes a Valid Claim of the Patent Rights.  (b) Therapeutic product not covered by the Patent Rights but discovered using Biological Materials. . . .

(emphases added).  A true and correct copy of this correspondence is attached hereto as Exhibit 7.  As Dr. Quisel's correspondence reveals, Acceleron clearly set forth its position with respect to the sublicensing of Secondary Licensed Products when it wanted and was negotiating for that right, but now—when it is time to pay Salk—appears to have changed its position.

48.     At the time of filing this Verified Complaint, Acceleron has paid Salk none of the $4.875 million owed to Salk in connection with the $25 million up-front payment from Celgene and the subsequent $7.5 million milestone payment received by Acceleron from Celgene.  Acceleron has likewise failed to pay interest in the amount of 1.5% compounded monthly on its late payments, as required by Section 9.5 of the ActRIIB License.

49.     On or about May 10, 2012, pursuant to Section 12.3 of the ActRIIB License, representatives of Salk and Acceleron with decision-making authority met to attempt in good faith to negotiate a resolution of the parties' disputes.  The parties were unable to resolve the dispute.

50.     On or about July 10, 2012, pursuant to Section 10.2(b)(i) of the ActRIIB License, William R. Brody, President of Salk, sent a letter (dated July 5, 2012) directed to Acceleron's legal department, informing Acceleron that it is in material breach of the ActRIIB License in relation to payments received by Acceleron from Shire and Celgene.

51.     Salk is informed and believes, and based thereon alleges, that its damages exceed the amount of seventy-five thousand dollars ($75,000), exclusive of costs and interest.

## COUNT 1
### (Breach of Contract – Revenue from Shire Agreement)

52.     Salk repeats and realleges paragraphs 1 through 52 as though fully set forth herein.

53.     Salk and Acceleron are parties to the ActRIIB License.

54.     At all times, Salk has performed its obligations under the terms of the ActRIIB License.

55.     Acceleron has materially breached the terms and provisions of the ActRIIB License by, at a minimum, failing to provide Salk its full share of the $45 million upfront payment received by Acceleron from Shire for the ACE-031 product.

56.     According to the ActRIIB License, Salk is due 10% of the $45 million upfront payment, plus interest of 1.5% compounded monthly for late payment.

57.     To date, Acceleron has paid Salk only $225,000 in connection with its revenue related to ACE-031 from the Shire Agreement.

58.     As a result of this breach, Salk has been damaged at least in the amount of $4,275,000 plus interest of 1.5% compounded monthly for late payment, or more according to proof at trial.

## COUNT 2
### (Breach of Contract – Revenue from Celgene Agreement)

59.     Salk repeats and realleges paragraphs 1 through 52 as though fully set forth herein.

60.     Salk and Acceleron are parties to the ActRIIB License.

61.     At all times, Salk has performed its obligations under the terms of the ActRIIB License.

62.     Acceleron has materially breached the terms and provisions of the ActRIIB License by, at a minimum, failing to provide Salk its full share of the $25 million upfront payment and $7.5 million milestone payment received by Acceleron from Celgene for the ACE-536 product.

63.     According to the ActRIIB License, Salk is due 15% of the $32.5 million received from Celgene, $4,875,000, plus interest of 1.5% compounded monthly for late payment.

64.     To date, Acceleron has provided no payment in connection with its revenue related to ACE-536 from the Celgene Agreement.

65.     As a result of this breach, Salk has been damaged at least in the amount of $4,875,000, plus interest of 1.5% compounded monthly for late payment, or more according to proof at trial.

## COUNT 3
### (Breach of the Implied Covenant of Good Faith and Fair Dealing – Celgene Sublicensing Revenue)

66.     Salk repeats and realleges paragraphs 1 through 52 as though fully set forth herein.

67.     The ActRIIB License between Salk and Acceleron contains an implied

promise of good faith and fair dealing, by which the parties promise not to prevent each other from receiving the benefits to which the other party is entitled under the agreement.

68.     In 2008, Acceleron requested that the May 2004 License be amended to include the right to sublicense Secondary Licensed Products in addition to Primary Licensed Products. The parties agreed to this amendment by the February 2008 Letter Agreement. The right to sublicense Secondary Licensed Products was incorporated into the ActRIIB License, which amended and restated the May 2004 License.

69.     Acceleron now claims that a sublicense to a Secondary Licensed Product that was discovered using Salk Activin Receptor Technology, ACE-536, does not constitute a sublicense under the ActRIIB License.

70.     By denying that the Celgene Agreement is a sublicense under the express terms of the ActRIIB License and concealing the agreement and payment from Salk, Acceleron has breached the covenant of good faith and fair dealing and prevented Salk from receiving is due share of the payments that Acceleron received for ACE-536 from the Celgene Agreement.

71.     As a result of Acceleron's breach of the implied covenant of good faith and fair dealing, Salk has been damaged at least in the amount of $4,875,000, plus interest of 1.5% compounded monthly for late payment, or more according to proof at trial.

## COUNT 4
### (Breach of the Implied Covenant of Good Faith and Fair Dealing – Shire Sublicensing Revenue)

72.     Salk repeats and realleges paragraphs 1 through 52 as though fully set forth herein.

73.     The ActRIIB License between Salk and Acceleron contains an implied promise of good faith and fair dealing, by which the parties promise not to prevent each other from receiving the benefits to which the other party is entitled under the agreement.

74.     Section 3.5 of the ActRIIB License sets forth the applicable percentages of Sublicensing Revenue as defined in Section 1.15 due to Salk, depending on the relative stage in a product's development at which a sublicense is granted.  For ACE-031, the applicable percentage due to Salk is 10% of Sublicensing Revenue.

75.     Acceleron now claims that none of the percentages listed in Section 3.5 apply to calculating Salk's share of Sublicensing Revenue from ACE-031.

76.     By denying that the 10% rate recited by the ActRIIB License applies to the $45M payment received from Shire, Acceleron has breached the covenant of good faith and fair dealing and has prevented Salk from receiving is share of the payments that Acceleron received for ACE-031.

77.     As a result of this breach, Salk has been damaged at least in the amount of $4,275,000 plus interest of 1.5% compounded monthly for late payment, or more according to proof at trial.

## COUNT 5
### (Declaratory Relief – Secondary Licensed Product Sublicense)

78.     Salk repeats and realleges paragraphs 1 through 52 as though fully set forth herein.

79.     An actual and present controversy exists between Salk and Acceleron relating to Salk's right to the payment of Sublicensing Revenue in connection with the payments relating to ACE-536 made by Celgene to Acceleron pursuant to the Celgene Agreement.

- 21 -

80.     In the Celgene Agreement, Acceleron granted Celgene an exclusive, royalty-bearing license to offer for sale, sell, make, have made, use and import ACE-536, at least a Secondary Licensed Product under the ActRIIB License.  Acceleron granted this license to Celgene prior to the initiation of the first Phase II clinical trial for ACE-536.

81.     Accordingly, Salk contends that it is entitled to a 15% share of payment received by Acceleron related to ACE-536, as set forth in Section 3.5 of the ActRIIB License.

82.     Acceleron contends that the rights to ACE-536 granted in the Celgene Agreement are not a sublicense of the ActRIIB License, and no Sublicensing Revenue is due.

83.     Salk requests a declaration that Acceleron's license to Celgene related to ACE-536, at least a Secondary Licensed Product under the ActRIIB License, is a Sublicense of the ActRIIB License, and payments made to Acceleron under the Celgene Agreement relating to ACE-536 are subject to Sublicensing Revenue.

84.     Salk further requests a declaration that Salk is entitled to Sublicensing Revenue of 15% of payments received by Acceleron related to the ACE-536 product.

## COUNT 6
### (Declaratory Relief – ACE-031)

85.     Salk repeats and realleges paragraphs 1 through 52 as though fully set forth herein.

86.     An actual and present controversy exists between Salk and Acceleron relating to Salk's right to the payment of 10% of Sublicensing Revenue in connection with payments relating to ACE-031.

- 22 -

87. In the Shire Agreement, Acceleron granted Shire a license to develop and manufacture ACE-031, among other rights. ACE-031 is a Primary Licensed Product, and such grant was made after the initiation of the first Phase II clinical trial for ACE-031.

88. Accordingly, Salk contends that it is entitled to a 10% share of payment received by Acceleron related to ACE-031, as set forth in Section 3.5 of the ActRIIB License.

89. To date, Shire has paid Acceleron $45 million related to ACE-031, and Acceleron has paid Salk only $225,000, which corresponds to a 0.5% share of payment received by Acceleron.

90. Salk requests a declaration that Salk is entitled to Sublicensing Revenue of 10% of payments received by Acceleron related to the ACE-031 product.

### PRAYER FOR RELIEF

WHEREFORE, Salk requests that this Court enter judgment in Salk's favor and against Acceleron as follows:

### ON THE FIRST AND FOURTH COUNTS

91. An order awarding Salk damages in the amount of $4,275,000 plus interest of 1.5% compounded monthly for late payment, or more according to proof at trial; and

92. Such other relief as the Court deems just and appropriate.

### ON THE SECOND AND THIRD COUNTS

93. An order awarding Salk damages in the amount of $4,875,000 plus interest of 1.5% compounded monthly for late payment, or more according to proof at trial; and

- 23 -

94.    Such other relief as the Court deems just and appropriate.

### ON THE FIFTH COUNT

95.    An order declaring that Acceleron's license to Celgene for rights to offer for sale, sell, make, have made, use and import ACE-536, at least a Secondary Licensed Product under the ActRIIB License, is a Sublicense of the ActRIIB License, subject to payments to Salk of Sublicensing Revenue;

96.    An order declaring that Salk is entitled to Sublicensing Revenue of 15% of payments received by Acceleron related to the ACE-536 product; and

97.    Such other relief as the Court deems just and appropriate.

### ON THE SIXTH COUNT

98.    An order declaring that Acceleron's license to Shire relating to ACE-031 is a Sublicense of the ActRIIB License, and that Salk is entitled to Sublicensing Revenue of 10% of payments received by Acceleron related to the ACE-031 product;

99.    An order declaring that Salk is entitled to Sublicensing Revenue of 10% of payments received by Acceleron related to the ACE-031 product; and

100.    Such other relief as the Court deems just and appropriate.

### JURY DEMAND

Salk respectfully requests a jury trial on all issues triable thereby.

October _18_, 2012                              Respectfully submitted,

Michael N. Sheetz (BBO #548770)
COOLEY LLP
500 Boylston Street
Boston, MA  02116-3736
Telephone:  (617) 937-2300
Facsimile:  (617) 937-2400
Email:        msheetz@cooley.com

Steven M. Strauss (*pro hac vice application pending*)
Anthony M. Stiegler (*pro hac vice application pending*)
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121-1909
Telephone:  (858) 550-6000
Facsimile:  (858) 550-6420
Emails:      sms@cooley.com
                  astiegler@cooley.com

ATTORNEYS FOR PLAINTIFF THE SALK
INSTITUTE FOR BIOLOGICAL STUDIES

## VERIFICATION

I, ROBERT S. MACWRIGHT, declare as follows:

I am the Executive Director of the Salk Institute Office of Technology Development, and am authorized to make this verification for and on behalf of The Salk Institute for Biological Studies.  I have read the foregoing document entitled "Verified Complaint," and know the contents thereof.  The matters stated therein are true of my own knowledge, except as to those matters stated on information or belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Verification was executed on October 8th, 2012.

Robert S. MacWright, Ph.D., Esq.